[No. E001553. Fourth Dist., Div. Two. June 6, 1985.]

CLARENCE A. SMITH, JR., Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
CONTINENTAL CASUALTY COMPANY, Respondents.

**COUNSEL**

Michael J. McNeil and Geffner & Satzman for Petitioner.

Zonni, Ginocchio & Taylor and David W. Gunder for Respondents.

**OPINION**

**KAUFMAN, J.**—More than five years after the date of injury, applicant Clarence A. Smith, Jr. (applicant) petitioned the Workers' Compensation Appeals Board (WCAB or Board) to set aside its orders dated May 4, May 18 and May 24, 1979, approving a compromise and release (C&R) between him and his employer Martin Marietta and its workers' compensation carrier, Continental Casualty Company (collectively defendant). After hearing, a workers' compensation appeals judge (WCJ) made an order granting applicant's petition. However, the Board granted reconsideration and in its decision after reconsideration rescinded the WCJ's order and denied applicant's petition on the ground that the petition was filed more than five years after the date of injury, so the Board's earlier orders could not be set aside except upon the ground of fraud and no fraud had been shown.[1] Applicant then petitioned this court for a writ of review and we issued a writ to review the propriety of the Board's decision after reconsideration. After a thorough review of the record we affirm.

---

[1] The decision was by a three-member panel, one member dissenting.

*Facts*

The facts are well stated in the Board's opinion and order granting reconsideration and decision after reconsideration and we borrow extensively therefrom.

In May 1975 applicant filed an application for adjudication in which he alleged that he sustained an industrial injury on December 30, 1974, when he was hit on the head with a piece of iron. Applicant was diagnosed as having sustained a fracture of the sphenoid bone, spinal fluid rhinorrhea and a concussion. Applicant subsequently underwent three intracranial operations, the last of which occurred on November 28, 1978. In a report dated December 27, 1978, Dr. James Coulter, the neurosurgeon who performed the surgery and who the parties accepted as an agreed medical examiner, said that applicant was temporarily disabled and said that he expected the condition to become stationary by "approximately" July 1979. In a supplemental report dated March 16, 1979, Dr. Coulter said that applicant had reached a "relatively stationary standpoint" but thought that further neurosurgical followup would be indicated within a period of six months and then at annual intervals for two to three years to evaluate applicant's progress. Dr. Coulter said that he thought that applicant had improved sufficiently at that time so he might return to gainful employment. He noted that applicant's last EEG was normal and said that applicant had a posttraumatic head syndrome that would be rated at between less than slight and slight, which would correspond to a standard rating of 15 percent. He then said: "This is only an estimate and my final opinion will be rendered when he returns in six months, at which time it is probable, with reasonable probability that his condition will have completely stabilized." He also recommended that applicant not climb ladders until his complaints of dizziness had subsided.

Dr. Coulter's next report was dated July 6, 1979. In that supplemental report he stated that applicant had returned to his office on July 3, 1979, to request a letter releasing him to work and that such letter was provided to him on July 6, 1979. He said that the only restriction necessary at that time was one from climbing to heights, because of the "rare" chance that he might become dizzy and fall. He also said that applicant was permanent and stationary with factors of disability consisting primarily of: "Constant, less than slight to slight subjective complaints of headaches, intermittent dizziness, loss of sense of smell and nasal congestion. . . ."[2]

---

[2]That portion of the report read in full: "Constant, less than slight to slight subjective complaints of headaches, intermittent dizziness, loss of sense of smell and nasal congestion. From an objective standpoint, he has a well-healed bifrontal craniotomy with a slight co-

On May 3, 1979, before Dr. Coulter's supplemental report, the parties submitted a proposed C&R in which they agreed to settle an injury that was described as having occurred on December 30, 1974. This date was apparently taken from the application filed by applicant. The actual date of injury was December 21, 1974.

The proposed C&R stated that applicant's present disability was "in dispute," that applicant had not returned to work and that the condition was permanent and stationary as of March 16, 1979. It further stated that temporary disability had been paid to applicant in the sum of $18,002 at the rate of $119 per week for "broken periods," that the amount due and unpaid to applicant was $7,344, and that permanent disability indemnity had been paid to the employee "in part as temporary disability." The next paragraph provided that the parties agreed to settle the claim by payment of $15,000, plus the amount shown as "due and unpaid to the employee under temporary disability." The proposed C&R also provided that of the $15,000 a fee of $2,200 would be paid to applicant's attorneys, another $250 would be paid to applicant's attorney's apparently for reimbursement of costs, two medical liens in the sum of $525 would be allowed, defendant would have credit for permanent disability advances of $3,000 and defendant was to pay Employment Development Department's (EDD) lien over and above the amount of the C&R.

The reason for the C&R was stated as being: "Serious dispute exists as to nature, extent and duration of disability. Dispute exists as to apportionment, the Agreed Medical Examiner, Dr. Coulter found a portion of applicant's complaints to be the result of a 1977 non-industrial auto accident which occurred after the herein industrial injury. Dispute exists as to need for further medical treatment. All parties waive provisions of Labor Code Sec. 5313."

On May 4, 1979, a WCJ issued an order approving the C&R. That order provided that payment would be made in the sum of $22,344, less the previously mentioned liens for costs and attorney's fees.

Subsequently, defendant wrote the WCJ a letter which asserted that there had been a "clerical" error in the C&R papers with respect to the unpaid temporary disability amount of $7,344. Defendant stated the period of tem-

---

semtic [*sic*] defect in the forehead, total exenteration of the frontal and most of the ethmoid sinuses which should provide no functional disability, total anosmia or loss of smell, and a repaired spinal fluid leak and basal skull/cribriform plate with homograft dura [fascia] lata and acrylic plastic." He also said that at that time there was no evidence of continued spinal fluid rhinorrhea and that: "[W]ithin reasonable probability, the spinal fluid leak will not require. [*Sic.*] Long term antibiotics are not needed. The patient had a transient psychiatric reaction . . . without rateable residual at this time."

porary disability was calculated as being from December 1974 to March 1976 which amounted to $7,344, but that during that period applicant received a total of $3,094 from the EDD which had paid UCD benefits for the period from July 15, 1975, to January 12, 1976, and that the EDD lien should have been paid by applicant. The letter then stated that applicant's attorney had agreed that this was correct. Accordingly, counsel requested the WCJ to issue an amended order that would deduct $3,094 from applicant's recovery and have this amount payable to EDD. The letter also stated that applicant has already returned to defendant the $3,094. Defendant agreed to add an additional $375 to the overall settlement amount. The letter indicated a copy of it had been sent to applicant's attorney but, of course, not to the applicant personally.

On May 18, 1979, pursuant to defendant's letter the WCJ issued an order amending the C&R to provide for the deduction of $3,094 payable to EDD and the addition of $375 to the settlement amount. However, the WCJ inadvertently failed to include a provision for the $2,200 attorney's fees that had previously been approved, so on May 24, 1979, the WCJ issued another amended order including attorney's fees.

According to applicant, thereafter he was "uncomfortable with what was going on" and went to six different attorneys before obtaining the services of the firm of Van der Nat, McNeil & Heywood. On July 1, 1983, eight and one-half years after applicant's injury and four years after the last amended order approving the C&R, that firm filed a declaration of readiness which stated: "Set on Conference Motion for acounting to be made as against Compromise & Release, and Motion to set aside C&R." (This declaration of readiness is the document we have referred to and will continue to refer to as the petition to set aside the orders approving the C&R.)

The petition did not specify the ground upon which applicant sought to set aside the Board's orders approving the C&R. In the minutes of the hearing on the petition the issue was phrased as: "[M]otion to set aside the Compromise & Release on grounds: (1) Mutual mistake of fact; (2) Failure of consideration; (3) negligent misrepresentation; (4) Denial of due process of law." Fraud was not mentioned.

At the hearing applicant testified that he did not realize he was releasing his claim and that he signed the C&R because he needed rent money. He also testified that he returned approximately $5,000 to defendant. However, one of defendant's claims personnel testified that applicant returned only $3,094. Applicant's former attorney testified that he settled the case based on the assumption that applicant's disability was 15 percent standard. He also testified that the parties agreed to add half of the value of another

surgery (approximately $15,000), that defendant prepared the proposed C&R and that he took defendant's word for what was owed. He also said that he explained the difference between a C&R and a stipulated award to applicant and said that he thought applicant understood he was releasing his entire claim.

On July 19, 1984, the WCJ issued a decision granting applicant's motion to set aside the C&R. The opinion on decision states the petition was granted because the C&R was "a negligent misrepresentation, if not, a fraud upon the court." The reasons for that conclusion were stated as follows:

". . . The conduct surrounding the compromise and release included: failure to pay temporary disability current as promised; failure to pay the Employment Development Department lien as promised; incorrect statement of date of injury; stating applicant was permanent and stationary when applicant was not permanent and stationary; misstating disability paid and credits therefor; altering a compromise and release without consent from the applicant; structuring a compromise and release so as to allow 27½ percent as attorneys' fees as against awardable permanent disability; improper attestation of applicant's signature; and so structuring a compromise and release as to make a determination of adequacy deceptive."

### Discussion

██ ██ The Board's reasoning in rescinding the WCJ's order and denying the petition to set aside its previous orders is so cogent that we cannot do better than to set it forth.

"The proceedings to set aside the Compromise and Release were not instituted within five years of the date of injury. Consequently, the Board may not set aside the Compromise and Release unless it finds that it was procured by fraud. [Citation.] Therefore it is impermissible to overturn the Compromise and Release because there was a 'negligent misrepresentation if not fraud'. The trier of fact cannot equivocate in this manner. The difference between fraud and negligence is a . . . material one. If the former exists the case can be reopened. If only the latter exists, the case cannot be reopened.

"In his Report, the WCJ set forth several reasons for his conclusion that there was a 'negligent misrepresentation if not fraud.' He noted that applicant did not personally consent to the amendment of the Compromise and Release to provide that applicant was to pay the lien of EDD. But this change was made with applicant's attorney's consent. Moreover applicant was immediately apprised of the change and immediately paid defendant the

amount of EDD's lien. Furthermore, defendant agreed to pay applicant an additional $375.00 for applicant's consent to this change. Thus we do not see how there could possibly be any fraud here.

"The WCJ also noted that the date of injury was actually December 21 rather than December 30 as set forth in the proposed Compromise and Release. However applicant has not alleged that the nine day difference is so significant that it would be material in the light of the entire amount of the Compromise and Release. The $102.00 at issue is less than half of 1% of the value of the Compromise and Release. Moreover the date was based on the representation by applicant in the Application for Adjudication. Thus this discrepancy does not amount to fraud.

"The WCJ also noted that the proposed Compromise and Release was not witnessed by disinterested witnesses. But this also does not constitute fraud. This is at most a technical defect. The genuineness of applicant's signature is not in issue here.

"The WCJ also noted that the attorney's fee was disproportionate to the amount that would be paid to applicant. This is also not fraud. Moreover the percentage of the total recovery that would be paid to the attorney was apparent from the face of the record when the amended orders issued.

"The WCJ also said that the Compromise and Release stated that applicant was permanent and stationary at a time when he was still temporarily disabled. However Dr. Coulter's report of March 16, 1979 did say that applicant was permanent and stationary. Certainly it may be said that his statement was equivocal, but this does not mean that there was overt deception in listing March 16, 1979 as the permanent and stationary date. The degree of certainty in Dr. Coulter's statement was apparent from the face of the record. Therefore the WCJ who had approved the Compromise and Release had access to as much knowledge of the permanent and stationary date as the attorneys did. Furthermore Dr. Coulter's report of July 6, 1979, which is apparently the basis for the WCJ's conclusion that applicant was not permanent and stationary on March 16, 1979, occurred after the Compromise and Release was approved. Obviously then that report was not concealed from anyone when the Compromise and Release was approved. Thus there was no basis to find fraud in the representation that was made as to the permanent and stationary date.

"The remaining reason that the WCJ gave for setting aside the Compromise and Release was that the statements regarding the amounts of temporary disability and permanent disability could have been confusing to the WCJ who had approved the Compromise and Release. Certainly the state-

ments in the proposed Compromise and Release could have been clearer; however a finding of fraud cannot be based on the speculation that the WCJ might have been confused as to what had been paid and what was going to be paid. There is no substantial evidence in the record that he was under a mistaken assumption because of a deceitful representation.[2] The same omissions and circumlocutions in the proposed Compromise and Release were present before both WCJ's. The former WCJ evidently felt they were not significant enough to require further proceedings. The second WCJ evidently feels differently and if the issue were whether the Compromise and Release should have been approved in the first place, his point might be well-taken. But that is not the issue. The issue is only whether there has been deceit. And here deceit has not been proven.

"One can often in retrospect review a proposed Compromise [and] Release and conclude that if only the attorney had pursued an issue more thoroughly or if only he had expanded more upon the perimeters of a dispute, the WCJ might have concluded that the realistic settlement value of the case was greater than the amount it was settled for. But Compromises and Releases cannot be rescinded so easily. The legislative policy is to permit carriers to know that after a certain time period has elapsed and a case has been disposed of, that case can be 'written off'. . . . Thus the Board should not take the initiative in seeing [*sic*] out reasons to set aside a Compromise and Release. Rather we should limit ourselves to determining whether the party seeking to set aside the Compromise and Release more than five years from the date of injury has pleaded and proved fraud. Here this did not occur. Accordingly the decision must be rescinded."

We agree entirely with the reasoning of the Board. ■ "An approved workers' compensation compromise and release rests 'upon a higher plane than a private contractual release; it is a judgment, with "the same force and effect as an award made after a full hearing."'' (*Johnson* v. *Workmen's Comp. App. Bd.* (1970) 2 Cal.3d 964, 973 [88 Cal.Rptr. 202, 471 P.2d 1002], quoting from *Raischell & Cottrell, Inc.* v. *Workmen's Comp. App. Bd.* (1967) 249 Cal.App.2d 991, 997 [58 Cal.Rptr. 159].)" (*City of Anaheim* v. *Workers' Comp. Appeals Bd.* (1982) 128 Cal.App.3d 200, 206 [180 Cal.Rptr. 132].) Within five years of the date of injury, an order of the Board approving a C&R, like other orders, decisions and awards of the Board may be rescinded, altered, or amended by the Board upon a showing of "good cause." (Lab. Code, § 5803[3]; *Brunski* v. *Industrial Acc. Com.*

---

[2]The prior WCJ is experienced and we must assume that if he believed the proposed Compromise and Release was unclear or if he felt that the settlement amount was disproportionate to the realistic value of the case, he would not have approved the Compromise and Release."

[3]All statutory references will be to the Labor Code unless otherwise specified.

(1928) 203 Cal.761, 764 [265 P. 918]; *Silva* v. *Industrial Acc. Com.* (1924) 68 Cal.App. 510, 515-517 [229 P. 870]; see 1 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1985 rev.) § 8.05[4].) However, upon the expiration of five years after the date of injury the Board's continuing jurisdiction to rescind, alter or amend its orders, decisions and awards terminates, except as to petitions for such relief filed before the expiration of the five-year period. (§ 5804; *Dow Chemical Co.* v. *Workmen's Comp. App. Bd.* (1967) 67 Cal.2d 483, 490-491 [62 Cal.Rptr. 757, 432 P.2d 365]; *Liberty Mut. Ins. Co.* v. *Workers' Comp. Appeals Bd.* (1981) 118 Cal.App.3d 265, 275 [173 Cal.Rptr. 349]; *Harold* v. *Workers' Comp. Appeals Bd.* (1980) 100 Cal.App.3d 772, 786 [161 Cal.Rptr. 508].) And when the Board's jurisdiction to rescind, alter or amend has terminated, an order approving a compromise and release, like other awards of the Board, constitutes a final judgment entitled to full res judicata effect. (See *Brunski* v. *Industrial Acc. Com.*, *supra*, 203 Cal. 761, 764; *City of Anaheim* v. *Workers' Comp. Appeals Bd.*, *supra*, 128 Cal.App.3d 200, 206, 211; see also *Dow Chemical Co.* v. *Workmen's Comp. App. Bd.*, *supra*, 67 Cal.2d 483, 491; *Liberty Mut. Ins. Co.* v. *Workers' Comp. Appeals Bd.*, *supra*, 118 Cal.App.3d 265, 275; *Harold* v. *Workers' Comp. Appeals Bd.*, *supra*, 100 Cal.App.3d 772, 786-787.) As with other final judgments, after the Board's jurisdiction to rescind, alter or amend has expired, an award may be set aside only upon a showing of fraud or mistake of the kind generally referred to as "extrinsic" fraud or mistake. (*Kulchar* v. *Kulchar* (1969) 1 Cal.3d 467, 470-471 [82 Cal.Rptr. 489, 462 P.2d 17, 39 A.L.R.3d 1368]; *Jorgensen* v. *Jorgensen* (1948) 32 Cal.2d 13, 17-19 [193 P.2d 728]; *Pico* v. *Cohn* (1891) 91 Cal. 129, 133-134 [25 P. 970, 27 P. 537]; *Kachig* v. *Boothe* (1971) 22 Cal.App.3d 626, 632-634 [99 Cal.Rptr. 393]; see 3 Larson, The Law of Workmen's Compensation (1983) §§ 81.24(a), 81.51(a).)

 The Board was correct in concluding no such fraud was shown. We do not even perceive any negligent misrepresentation. As the Board indicated in its decision, virtually everything that was in front of the WCJ at the hearing in 1984 was also in front of the WCJ who approved the C&R in 1979 with the exception of Dr. Coulter's supplemental report which had not then been issued. Nor does the record show that anything was concealed from applicant or his attorney. The letter written by defendant to the WCJ concerning the asserted mistake fully explained what the mistake was claimed to be and how it was claimed to have come about. A copy of the letter, which asserted counsel had agreed to the change, was sent to applicant's attorney of record and he lodged no objection to the request for amendment either before the amendatory order was issued or thereafter. Applicant himself had previously been contacted about the asserted mistake and had returned to defendant the disputed $3,094. It may be that applicant

did not fully understand the asserted mistake, but he was represented by counsel and it is inconceivable that counsel did not understand defendant's claim of mistake or defendant's request that the C&R be amended.

Although the applicant's testimony at the hearing does not disclose any specific mistake on his part, if there was any it would appear to have been purely unilateral and certainly not the type of mistake that would constitute a sufficient ground upon which to set aside a final judgment. (Cf. *Kulchar* v. *Kulchar, supra,* 1 Cal.3d 467, 471-473; *Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d 13, 22-23; 1 Hanna, *supra,* § 8.05[4][e].)

Undoubtedly had the petition to vacate the C&R been made within five years of the date of injury, the circumstances would have been sufficient to permit the Board to rescind its earlier orders under section 5803, particularly in view of several procedural irregularities we shall discuss. (See, e.g., *Brunski* v. *Industrial Acc. Com., supra,* 203 Cal. 761, 764-765; *Nicky Blair's Restaurant* v. *Workers' Comp. Appeals Bd.* (1980) 109 Cal.App.3d 941, 955-958 [167 Cal.Rptr. 516]; 1 Hanna, *supra,* §§ 8.05[4][a], 8.05[4][d], 8.05[4][e].) However the circumstances are manifestly insufficient to warrant setting aside the earlier orders after the Board had lost jurisdiction to rescind, alter or amend. (§ 5804; cf. *Kulchar* v. *Kulchar, supra,* 1 Cal.3d 467, 471-473; *Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d 13, 17-19; see 3 Larson, *supra,* §§ 81.24(a), 81.51(a).)

■■■ We observe there were several procedural irregularities in the adjudication of this matter and inasmuch as applicant continues to assert an abridgement of his constitutional right to due process of law, it is appropriate that we examine these irregularities to determine whether they were such as to render the earlier orders voidable irrespective of the five-year time limit specified in section 5804. (See Rest.2d Judgments, ch. 5, Introductory Note and §§ 65-71.)

An application had already been filed with the Board and defendant had appeared, so the Board had both subject matter jurisdiction and in personam jurisdiction over the parties. The C&R as originally submitted to the Board for approval was signed by counsel for both parties and by applicant personally. ■■■ There was some question whether the two attesting witnesses were both disinterested (see § 5003), one assertedly having been an employee of applicant's attorney. However, that possible defect was not placed in issue at the hearing and in the absence of a showing of prejudice would not in itself justify setting aside the earlier orders after the Board had lost jurisdiction to rescind, alter or amend under section 5803.

■■ The procedural irregularities of concern commenced with defendant's letter to the WCJ asserting the $3,094 "clerical error" and requesting

an amendment of the C&R. Clearly, if there was a mistake it was not "clerical" in nature. The WCJ had made no mistake at all; he had approved the C&R as it was presented to him. The mistake was that of the parties, either unilateral or mutual, in the computations to arrive at the amount due the applicant for unpaid temporary disability benefits and, thus, the net settlement amount. The error was not one that could be corrected by the WCJ as a "clerical error."

It appears to us that the WCJ might appropriately have done one of several things. He might have requested a formal amended compromise and release, executed with the same formalities as the original (see § 5003). Alternatively, he might have required at least a written stipulation for amendment executed by counsel for all parties and by the applicant. Otherwise, he might have treated defendant's letter as a petition to amend the original order for good cause under section 5803. Then, of course, the matter would have been noticed for hearing and resolved at the hearing.

We have little doubt that the WCJ's failure to proceed in one of these ways was attributable to the informality customary in workers' compensation proceedings (see 3 Larson, *supra,* § 77(a) et seq.). In any event, in the circumstances shown here, the procedural irregularities involved in the WCJ's amending the original order without requiring a hearing or, alternatively, the filing of an amended compromise and release or a signed written stipulation are insufficient to compel invalidation of the amendatory orders. Applicant was represented by counsel, and, as previously indicated, counsel was fully aware of the claimed mistake and the letter requesting amendment. He did not communicate any objection to the requested amendment to the WCJ, either before or after issuance of the amendatory orders. Nor was reconsideration of the amendatory orders sought.

In addition, applicant was aware of the claimed overpayment and, indeed, repaid the $3,094 to the insurance carrier. Although applicant testified he consulted about six different lawyers before obtaining the services of the law firm that filed the petition to vacate the C&R, it was not until more than four years after the last amendatory order that the petition to vacate was filed. In the meantime, the Board had lost jurisdiction to alter or amend the C&R.

While the proceedings leading up to the amendment of the C&R were procedurally irregular, inasmuch as the Board had jurisdiction over the subject matter and the parties and applicant's attorney was given actual notice of the request for amendment, the amendatory orders must be viewed as valid, particularly in the absence of any petition for reconsideration or review. Even if the orders are viewed as having been rendered on default, the

procedural irregularities noted are insufficient to warrant setting the orders aside. ■ The Restatement Second of Judgments, section 67, provides in relevant part: "[A] judgment by default may be avoided if: [¶] (1) The failure to appear was the result of excusable neglect; [and] [¶] (2) The applicant for relief acted with due diligence in ascertaining that the judgment had been rendered and with reasonable promptness in seeking relief, and the application was made within the time limitation of an applicable statute or rule of court . . . ." ■ Here, the applicable statute imposing a time limitation was section 5804 and the petition to vacate was not filed within the five-year period. Moreover, although normally the question of due diligence is one of fact, we have little hesitancy in saying that in the circumstances here shown the failure to file a petition to vacate for more than four years after the last order, during which time the Board lost jurisdiction to rescind, alter or amend, demonstrates unreasonable delay as a matter of law.

### Disposition

The Board's decision after reconsideration is affirmed.

Morris, P. J., and McDaniel, J., concurred.

Petitioner's application for review by the Supreme Court was denied September 11, 1985.